AUSA: Steven P. Cares   Telephone: (313) 226-9139
Special Agent: Jacqueline Marquardt, FBI   Telephone: (571) 456-9697

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.
Michael Stout

Case No. Case: 2:22-mj-30104
Assigned To : Unassigned
Assign. Date : 2/28/2022
USA V. SEALED MATTER (CMP)(CMC)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __October, 2019__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC Section 666(a)(1)(B) | theft or bribery in programs receiving federal funds |

This criminal complaint is based on these facts:

See atttached Affidavit

☐ Continued on the attached sheet.

_____
Complainant's signature

Jacqueline Marquardt, Special Agent, FBI
Printed name and title

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: February 28, 2022

_____
Judge's signature

City and state: Detroit, Michigan

Kimberly G. Altman, United States Magistrate Judge
Printed name and title

## Affidavit in Support of a Criminal Complaint

The affiant, Jacqueline Marquardt, being duly sworn, deposes and states as follows:

### INTRODUCTION

1. I submit this affidavit in support of a complaint charging MICHAEL STOUT, who was, at the time of the conduct in the case, an officer with the Hamtramck Police Department, with federal programs bribery, in violation of 18 U.S.C. § 666(a)(1)(B). As explained in more detail below, STOUT agreed to provide sensitive police information, including vehicle registration information from the Michigan Law Enforcement Information Network (or LEIN) in exchange for things of value. STOUT received a total of $9,219.40 in things of value—a salvaged used car, tax, title, and plate costs (valued at $7,719.40) and $1,500 in cash—for agreeing to provide this information.

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am a Special Agent with the FBI Detroit, Michigan Field Office (FBI Detroit), assigned to the Public Corruption squad, which is located in the Eastern District of Michigan.

1

3. I make this affidavit from personal knowledge based on my participation in this investigation, including reports from other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

## PROBABLE CAUSE

4. Agents learned the following information from in-person and telephonic interviews, recordings, and text messages.

5. In October 2019, STOUT told an individual involved in the towing industry ("Tower A") that he was going to be retiring from Hamtramck Police Department and going to work for the Highland Park Police Department in their auto theft unit. With this new job, he told Tower A, he could "take care of" Tower A, but needed a car. At the request of the FBI, Tower A recorded his meetings and telephone calls with STOUT described in this affidavit.

2

6. STOUT later told Tower A that he actually needed two cars—that he's "buying" one and his daughter would buy another. Tower A responded with surprise, as he thought he was "giving them" to STOUT. STOUT responded he would "work something out" with Tower A, but he still "got" Tower A when he went to work at the Highland Park Police Department.

7. A few weeks later, Tower A and STOUT were discussing prices for available vehicles. Tower A explained that, if he was with a police department and could "look out" for him, it could affect the price. STOUT said he still worked with the Hamtramck Police Department and could "still look out for" Tower A. "In that case," Tower A responded, he had a couple of things he needed "taken care of." So if STOUT could "help him out" with those, he'll give STOUT the vehicle he needs. Tower A then asked if STOUT could call an employee with the Hamtramck Police Department (Employee B) to provide something to Tower A. STOUT agreed to call Employee B.

8. The next day, STOUT explained that he spoke to Employee B and arranged to get Tower A whatever he needed. Tower A explained that he didn't want to say it over the phone, but would tell

3

STOUT what he needed when they met in person. Tower A also said that he would provide STOUT with money for a rental car while they worked out what car STOUT wanted and "got it all set up."

9. Tower A and STOUT met the following day. TOWER A gave STOUT $500 in cash. Tower A explained: "I'll cover the rental for you [STOUT], but this is what I need. There's a white . . . Subaru following me." And he was worried it was "internal affairs" or "DPD" (the Detroit Police Department). STOUT told him to "give me the plate" and "I'll run it right now." STOUT then called Employee B, on speaker phone, and asked him to run the license plate through LEIN. (I know from training and experience that LEIN is a database that contains, among other things, registration information for vehicles and is available only to limited and authorized groups, including police officers.) Employee B performed the query and gave STOUT the information, which STOUT let Tower A listen to.

10. A few weeks later, Tower A had not yet given STOUT a car. So Tower A told STOUT that he would pay for the rental car he was using. Tower A also noted he had "one more thing [he] need[ed] him [STOUT] to do."

4

11. Tower A and STOUT met the next day. Tower A gave STOUT $1,000 in cash. Tower A told STOUT that an Impala had been following his trucks and gave him a license plate number. STOUT then called Employee B on speaker phone and asked if the officer could run something in LEIN. STOUT told Employee B to put the search under another officer's name. (I know from training and experience that, because of the sensitive nature of LEIN queries, each search must be attributed to an authorized user.) Employee B ran the search and told STOUT the results. During this telephone conversation with Employee B, STOUT used the speaker phone and allowed Tower A to listen.

12. In the same conversation, STOUT told Tower A that he was expecting to be sworn in with the Highland Park Police Department soon. Tower A responded that he has cars for STOUT—that he was "going to get" one. STOUT just needed to "go to work" so Tower A would have "someone [he] can trust." Tower A explained that if STOUT could just get into Highland Park Police Department, then they could both "start making some money."

13. Also in their conversation, STOUT offered to purchase a newer Chrysler 300 or Dodge Charger through Tower A's contact (who

5

is an undercover federal agent, discussed below). Tower A then explained that STOUT could get a "nice car on your own." Or Tower A could give STOUT a salvaged car that he had on his lot. In that case, STOUT "wouldn't have to pay [him]" and instead could "work it off." STOUT then clarified that, in the future, he would get a "nice" car. But he wanted the car Tower A had available.

14. A few days later, Tower A called STOUT and told him that he had a 2013 Chevrolet Equinox for him. He asked STOUT to text a picture of his driver's license so Tower A could get the information to a third-party who would facilitate the transaction (namely, the undercover federal agent as discussed below). STOUT asked if he would "owe . . . anything" to this person. Tower A explained that he, Tower A, was "taking care of everything for you [STOUT]" so there was nothing to pay for.

15. A few days later, on December 10, 2019, Tower A and an undercover federal agent ("UC") posing as Tower A's accomplice and used car dealership owner, met with STOUT so they could give STOUT the Equinox and sign necessary documents to transfer the title.

6

16. During this meeting, STOUT and Tower A talked about the Impala that Tower A suspected was a police vehicle. STOUT told the UC that Tower A was just "paranoid." Tower A told the UC that STOUT was "my guy" and was "going to look out for us"—that he could get "anything we need."

17. During this meeting, Tower A and STOUT also talked about a scheme for them to obtain abandoned vehicles in another state, bring them to Michigan, and resell them. Tower A told them they needed to keep a "small circle" to keep things secretive.

18. STOUT talked about other officers who were making money in "all kinda" ways, including by "chopping cars." But then STOUT volunteered that "I don't know nothing" about the officers' criminal behavior. Tower A and the UC laughed at this response. At another point in the conversation, STOUT talked about federal authorities questioning him concerning an investigation. STOUT said he was not cooperative and simply told the federal investigators "I don't know nothing."

19. At the end of the meeting, STOUT signed the title paperwork for the Equinox, claiming that he paid the UC $7,719.40

7

cash for the vehicle, plates, and tax. After the documents were signed, Tower A told STOUT: "I told you I got you. Let's make money."

20. The City of Hamtramck received more than $10,000 in federal funds during the 2019 calendar year.

## CONCLUSION

21. Based on the information stated above, there is probable cause to believe that MICHAEL STOUT committed bribery, in violation of 18 U.S.C. § 666(a)(1)(B).

_____
Jacqueline Marquardt, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic
means.

_____
Honorable Kimberly G. Altman
United States Magistrate Judge
Eastern District of Michigan

Dated: February 28, 2022